IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


STEVE MOWERY,

      Plaintiff,

vs.                              Case no. 3:04cv382-RS-EMT

ESCAMBIA COUNTY UTILITIES
AUTHORITY, a public agency,

      Defendant.
_____


## ORDER ON MOTION FOR SUMMARY JUDGMENT


Before the Court are Defendant Escambia County Utilities Authority's Motion for
Summary Judgment and Incorporated Memorandum of Law (Doc. 16) and the Plaintiff's
Response (Doc. 32).

## I.  FACTS

Plaintiff, Steve Mowery, is a White, heterosexual male.  For approximately ten
years, Mowery has been employed as a utility service technician with Defendant
Escambia County Utilities Authority (ECUA), a public agency that operates and
maintains a water and sewage treatment system in Escambia County, Florida, and
surrounding communities.  Mowery alleges that throughout his employment with ECUA,
his supervisor, Phil Coltrane, and several of Mowery's male co-workers, made repeated
jokes, statements, and comments suggesting that Mowery was homosexual.  The
Complaint also alleges that Coltrane made racially hostile jokes and comments directed
at minority employees with whom Mowery associated.  Mowery asserts that after he
formally complained about Coltrane's behavior to ECUA's human resources
department, ECUA took no remedial action and at Coltrane's direction, retaliated
against Mowery by forcing him to complete more difficult and even superfluous work

assignments.

After filing a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and receiving a Notice of Right to Sue, Mowery filed a three-count Complaint against ECUA on November 4, 2004.  Count One alleges that ECUA engaged in unlawful retaliation in employment against Mowery after he complained to ECUA's human resources department about Coltrane's inappropriate racial and sexual remarks, in violation of Title VII of the Civil Rights Act of 1964, as amended.  Count Two alleges that ECUA engaged in unlawful sex discrimination in employment against Mowery by making jokes and comments suggesting that Mowery is homosexual, in violation of Title VII of the Civil Rights Act of 1964, as amended.  Count Three alleges that ECUA engaged in sex discrimination and retaliation against Mowery, in violation of 42 U.S.C. §§ 1981 and 1983.

ECUA filed a Motion for Summary Judgment on December 29, 2005 (Doc. 16). ECUA argues that summary judgment is warranted on the retaliation claim asserted in Count One because Mowery suffered no adverse employment action after reporting Coltrane to human resources; even if Mowery did suffer adverse employment action, the evidence fails to support an inference that it was the complaint to human resources that caused the adverse action; and ECUA can articulate legitimate, nonretaliatory reasons for its actions that were not pretextual.  With respect to the unlawful sex discrimination in employment claim asserted in Count Two, ECUA argues that summary judgment is warranted because (1) harassment and discrimination based on an employee's sexual preference or orientation are not unlawful employment practices under Title VII; (2) the evidence fails to establish a prima facie case of sex discrimination; and (3) the Faragher/Ellerth affirmative defense applies because ECUA exercised reasonable care to prevent and to promptly correct the alleged harassment, and Mowery failed to take advantage of procedural mechanisms that would allow ECUA to remedy the alleged harassment.  Finally, ECUA argues that summary judgment is warranted on the sex discrimination and retaliation claims under 42 U.S.C. §§ 1983 and 1981 for the same reasons that it offers in support of summary judgment on Counts One and Two and because the sexual harassment and retaliation claims are not actionable under those statutes.

## II.  DISCUSSION

### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th

Cir. 1990) (citing Anderson, 477 U.S. at 251).

If the movant, here the defendant, satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991). "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (citing Adickes, 398 U.S. at 158-59).

"The summary judgment rule is to be applied in employment discrimination cases as in any other case." Fitzpatrick v. Winn-Dixie Montgomery, Inc., 153 F. Supp. 2d 1303, 1305 (11th Cir. 2001) (citing Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc)). In light of the summary judgment standard, the court will apply the relevant substantive law to the facts of the case.

**B. The Substantive Law**

### 1. Discrimination Based on Sex Under Title VII (Count Two)

Title VII prohibits discrimination against an employee on the basis of race, color, religion, sex or, national origin. 42 U.S.C. § 2000e to e-17. The United States Supreme Court has held that sexual harassment which creates a hostile or abusive work environment qualifies as discrimination based on sex under Title VII. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986). To establish a prima facie case of sexual harassment which creates a hostile or abusive work environment under Title VII, an employee must prove that (1) he belongs to a protected group; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based upon the employee's sex; (4) "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) the sexual harassment is imputable to the employer. Sparks v. Pilot Freight

Carriers, Inc., 830 F.2d 1554, 1557 (11th Cir. 1987) (citing Gupta v. Florida Board of Regents, 212 F.3d 571, 582 (11th Cir. 2000)).

ECUA argues explicitly or implicitly that (1) the statements allegedly made by its employees concerning Mowery's perceived sexual orientation are best characterized as "teasing" or "kidding" rather than as "harassing," especially because Mowery and the alleged harassers are all male and because Mowery is heterosexual; (2) the alleged harassment was based not on Mowery's *sex* but on Mowery's perceived *sexual orientation*, discrimination that is not actionable under Title VII; and (3) if the statements were "harassing," the harassment endured by Mowery was not sufficiently severe or pervasive to alter the terms of Mowery's employment and create a discriminatorily abusive working environment.  These arguments are addressed below:

### a.  Same-Sex Sexual Harassment

In Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998), the United States Supreme Court held that "sex discrimination consisting of same-sex sexual harassment is actionable under Title VII."  Id. at 82.  The Oncale Court recognized, however, that same-sex sexual harassment is more difficult to discern than sexual harassment that occurs between members of the opposite sex.  "[W]hen 'the challenged conduct . . . involves explicit or implicit proposals of sexual activity' between members of the opposite sex 'it is reasonable to assume those proposals would not have been made to someone of the same sex,' [but] the same assumption of disparate treatment . . . may not as readily be made in the same-sex harassment context." Davis v. Coastal Int'l Sec., Inc., 275 F.3d 1119, 1123 (D.C. Cir. 2002) (quoting Oncale, 523 U.S. at 80)). To overcome this problem, the Oncale Court identified in dicta three ways to prove same-sex sexual harassment: (1) where the alleged perpetrator's behavior is motivated by actual homosexual desire for the plaintiff (such as where a homosexual supervisor is attracted to a same-sex subordinate and makes unwanted sexual propositions and comments); (2) where "the harassment is framed in 'such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility' toward members of the same [sex] in the workplace" (such as where a female supervisor communicates that women should not be employed in certain positions within the company because they are women); and (3) where the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes

in a mixed-sex workplace" (such as where evidence exists that a male supervisor consistently treats men worse than women).  "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimination* . . . because of . . . sex."  Oncale, 523 U.S. at 80-81 (emphasis in original); Davis, 275 F.3d at 1123.

Here, Mowery does not allege, nor does the record support an inference, that any of the three scenarios identified by the Oncale Court are applicable to his case. The harassing comments allegedly experienced by Mowery were the following:

1.  Statement by Coltrane to Mowery's co-workers that Mowery's "asshole must be sore" because Mowery called in sick

2.  Statements by Coltrane on or about Memorial Day weekend, 2002, that Mowery must have been absent from work to "fly the gay flag at the beach" or that Mowery was "getting ready for the big weekend," both statements referencing a gay pride gathering at the beach that weekend

3.  Statement by a male co-worker asserting or implying that Mowery must be gay because he was forty years old, owned a house, had a truck paid for, and did not have a woman

4.   Statement by Coltrane to Mowery's co-worker to not sit in Mowery's chair because "his ass would get sore"

5.  Statement by Coltrane to Mowery's co-workers that he never heard Mowery brag about a woman or with whom he was sleeping

6.  Statement by two male co-workers that Mowery and another male co-worker had jumped naked together on a trampoline

7.   Laughing by co-workers when a worker from a different region of ECUA was assigned to work with Mowery on a particular day, supposedly because the co-workers believed that Mowery was gay

Clearly, such crude language and behaviors are unprofessional, insensitive, and inappropriate in a modern workplace.  Coltrane himself and an internal investigation conducted by ECUA substantiated many of the alleged occurrences.  The Court also notes that ECUA suspended and then demoted Coltrane to a non-supervisory position after it determined that Coltrane had made, or permitted to be made, inappropriate and

insensitive remarks relating to race and to the perceived sexual orientation of Mowery.

The question before the Court, however, is not whether the comments made by Mowery are rude, crude, insensitive, inappropriate, or offensive; rather, the question is whether such comments satisfy the prima facie case for discrimination based on sex under Title VII.  The Court concludes as a matter of law that they do not.  None of the three scenarios for proving same-sex sexual harassment that were enunciated by the Supreme Court in Oncale resemble Mowery's experience at ECUA.  First, Mowery does not allege, nor can it be properly inferred, that Coltrane or any of Mowery's co-workers were motivated by actual homosexual desire for Mowery.  Mowery was never propositioned for sex, either directly or indirectly, and neither the evidence nor the allegations suggest that any of the alleged perpetrators had any sexual desire for Mowery.

Second,  the alleged harassment was not framed in 'such sex-specific and derogatory terms . . . as to make it clear that the harasser[s] [were] motivated by general hostility' toward members of the same [sex] in the workplace."  It is not alleged, nor can it be inferred from the evidence, that Coltrane or any of the alleged perpetrators were generally hostile toward men.

Third, Mowery has not offered "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."  Mowery has not even discussed whether women were employed in the region to which he was assigned, nor has he compared the treatment of women to the treatment of men within his region or within ECUA.

Finally, the facts in Oncale are clearly distinguishable from the facts in this case.  Oncale was, on several occasions, subjected to sex-related, humiliating actions against him by three crew members while the rest of the crew was present.  Oncale, 523 U.S. at 77.  Two crew members physically assaulted Oncale in a sexual manner, and one threatened him with rape.  Id.  Although his supervisors recognized that potentially harassing behavior was occurring, they took no remedial action.  Id.  Oncale quit his job, "asking that his pink slip reflect that he 'voluntarily left due to sexual harassment and verbal abuse.'" Id.  Oncale stated that "I felt if I didn't leave my job, that I would be raped or forced to have sex." Id.  Mowery, unlike Oncale, was never physically assaulted or threatened with rape, nor did Mowery fear that rape was inevitable or even a possibility.

Mowery's alleged perpetrators did not sexually desire him.  Mowery never resigned from his position.  Upon learning of Mowery's complaints, human resources personnel met with Coltrane and conducted an investigation, reprimanded Coltrane, suspended him, and ultimately demoted him to a non-supervisory position.  Therefore, the facts in Mowery's case do not resemble the three factual scenarios enunciated by the Supreme Court for proving same-sex sexual harassment and are clearly distinguishable from the criminal sexual acts and the fear-inducing threats of rape that were present in Oncale.

### b. Sexual Harassment Based on Stereotypes

Mowery also implies that the harassment he allegedly endured qualifies as harassment based on sex because the harassment resulted from stereotypes associated with homosexuality.  For example, the alleged perpetrators asserted that Mowery must be homosexual because he was forty years old, owned a house, had a truck paid for, did not have a woman, and never publicized his sexual escapades with women to his coworkers.  In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the Supreme Court determined that discrimination based on stereotyping could, in certain situations, qualify as discrimination based on sex under Title VII.  The Court stated that

> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for 'in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'

Id. at 251.

In Hopkins, Plaintiff Ann B. Hopkins sued Price Waterhouse after being denied partnership.  The partners at Price Waterhouse described Hopkins as "macho," suggested that she "overcompensated for being a woman," advised her to take "a course at charm school," objected to her use of profanity "because it's a lady using foul language," explained that she "ha[d] matured from a tough-talking somewhat masculine hard-nosed [manager] to an authoritative, formidable, but much more appealing lady [partner] candidate," and was told that in order to improve her chances for partnership, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  Id. at 235.  The Hopkins Court

determined that "employment decisions that are based on sex stereotypes are actionable under Title VII because 'an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.'" Jeremy S. Barber, Comment, <u>Re-Orienting Sexual Harassment: Why Federal Legislation Is needed to Cure Same-Sex Sexual Harassment Law</u>, 52 Am. U.L. Rev. 493, 502 (2002) (quoting <u>Hopkins</u>, 490 U.S. at 250). The Court explained its rationale as follows: "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." <u>Hopkins</u>, 490 U.S. at 251.

However, <u>Hopkins</u> is not this case. First, the discrimination in Hopkins was based on gender stereotyping, that is, stereotyping based on the qualities, behaviors, and personality features that have been traditionally assigned to women. The gender stereotype associated with being a woman is femininity. Hopkins was not perceived as feminine; rather, she was perceived as masculine. The Court stated that "There were clear signs . . . that some of the partners reacted negatively to Hopkins' [masculine] personality because she was a woman." <u>Id.</u> at 235. Applying this analysis to Mowery, a claim under Title VII could be stated if Mowery was able to show that the harassment he allegedly suffered was based on his perceived failure to conform to a masculine gender role. <u>See</u>, <u>e.g.</u>, <u>Rosa v. Park West Bank & Trust Co.</u>, 214 F.3d 213, 215-16 (1st Cir. 2000) (finding that a cause of action existed under a federal law if the defendant refused to give a loan application to a cross-dressing male because his dress "did not accord with his male gender"); <u>Simonton v. Runyon</u>, 232 F.3d 33, 38 (2d Cir. 2000) ("a suit [by a man] alleging harassment or disparate treatment based upon nonconformity with sexual stereotypes is cognizable under Title VII as discrimination because of sex"); <u>Centola v. Potter</u>, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) (denying summary judgment because evidence suggested that co-workers may have perceived the plaintiff as "impermissibly feminine for a man"); <u>Ianetta v. Putnam Investments, Inc.</u>, 2002 U.S. Dist. LEXIS 3277, *15-*16 (D. Mass. 2001) (Plaintiff stated a cause of action under Title VII where he alleged that he was discriminated against because he did not conform to the male gender stereotype).

Here, the evidence is clear that the stereotypes experienced by Mowery were not

based on his failure to conform to his expected gender role.  The gender stereotype associated with being a man is masculinity.  Mowery does not allege, nor can an inference be properly drawn, that Mowery was perceived by Coltrane and his co-workers as being feminine rather than masculine.  Being forty years old, owning a home and truck, living alone, and not discussing one's sexual partners are not feminine gender traits.  These characteristics may reflect stereotypes associated with a homosexual lifestyle, but they are not stereotypes associated with a feminine gender.  In fact, owning a truck and working as a utility service technician in a water and sewage treatment company are characteristics that are more commonly associated with a masculine gender role.

Second, the masculine traits that were associated with Hopkins directly impacted her career.  Despite her successful two-year effort to secure a $25 million contract with the Department of State, Hopkins was nevertheless denied partnership even though her accomplishments exceeded those of the other partnership candidates at Price Waterhouse that year.  Hopkins, 490 U.S. at 234.  Here, Mowery does not allege nor does the evidence indicate that he suffered any adverse employment action because he was perceived as being feminine or unmanly.  In fact, Mowery does not even allege, nor can any inference be drawn, that Mowery suffered any adverse employment action because he was perceived as being homosexual.  Mowery alleges that his employment with ECUA was adversely affected only because he *reported* Coltrane for unlawful discrimination and was retaliated against for doing so, not because he was perceived as unmanly, feminine, or even homosexual.  In addition, although Mowery claims that Coltrane favored certain employees over others, he never asserts or implies that he was disfavored because he was perceived by Coltrane as being feminine or homosexual.

The alleged harassment experienced by Mowery is isolated to comments relating to Mowery's perceived sexual orientation, not to his manliness.  In Doe v. City of Belleville, Illinois, 119 F.3d 563, 568, 576-77 (7th Cir. 1997), vacated, 523 U.S. 1001 (1998), the male plaintiffs, unlike Mowery, were asked whether they were boys or girls; ridiculed for wearing earrings; called "bitches"; threatened with sexual assault, and one of the plaintiffs' testicles was grabbed to determine whether he was male or female.  In Nichols v. Azteca Restaurant Enters., Inc., 256 F.3d 864, 874 (9th Cir. 2001), the plaintiff was harassed for walking and carrying his tray "like a woman"; mocked for not

having sexual intercourse with a waitress who was his friend; referred to as "she" and "her"; and experienced vulgar name-calling couched in female terms.  The <u>Nichols</u> Court concluded that "this verbal abuse was closely linked to gender."  <u>Id.</u>  Unlike the plaintiffs in <u>Doe</u> and <u>Nichols</u>, Mowery's sex or gender were never questioned, nor was Mowery ever sexually assaulted, threatened with sexual assault, or an object of sexual desire.  For each of these reasons, Mowery was not sexually harassed under a stereotyping theory.

### c. Harassment Based on Sexual Orientation

Because it has been determined that Mowery cannot state a claim for sexual harassment under the same-sex sexual harassment framework of <u>Oncale</u> and the sexual stereotype paradigm of <u>Hopkins</u>, the Court examines whether Mowery can state a claim of sexual harassment based on his perceived sexual orientation.  In other words, does Title VII prohibit an employer from discriminating against an individual based on his or her sexual orientation or perceived sexual orientation?  The United States Supreme Court has not directly addressed this question, nor has the Eleventh Circuit.  <u>See</u> <u>Fredette v. BVP Mgmt. Assocs.</u>, 112 F.3d 1503, 1510 (11th Cir. 1997) (stating only that "[w]e do not hold that discrimination because of sexual orientation is actionable" without holding that discrimination because of sexual orientation is *not* actionable).   However, this Court concludes that Title VII, at least in its current form, permits no cause of action when the alleged harassment is based *solely* on one's sexual orientation or perceived sexual orientation.

First, the plain language of the Title VII statute belies any interpretation that the statute protects one who has been discriminated against based on his or her sexual orientation or perceived sexual orientation.  The statute states that "It shall be an unlawful employment practice for an employer . . . (1) to discriminate against . . . any individual because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  The statute does not prohibit discrimination against an individual because of such individual's *sexual orientation*.  Clearly, sex and sexual orientation are not the same, the former referring to one's biological makeup as a man or a woman, the latter referring to one's mating preferences.

Second, Title VII was enacted to protect minorities and women, not to protect homosexuals.  Accordingly, the statute should be read consistently with that purpose:

> The major concern of Congress at the time the Act was promulgated was race discrimination.  Sex as a basis of discrimination was added as a floor amendment one day before the House approved Title VII, without prior hearing or debate. Willingham v. Macon Telegraph Publishing Co., 507 F.2d 1084, 1090 (5th Cir. 1975); Developments in the Law - Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L.Rev. 1109, 1167 (1971).  1964 U.S. Code Cong. & Admin. News, pp. 2355-2519.
>
> The 1972 Amendments to Title VII in the Equal Employment Opportunity Act of 1972 left the language of § 2000e-2(a)(1) unchanged, but the clear intent of the 1972 legislation was to remedy the economic deprivation of women as a class. 1972 U.S. Code Cong. & Admin. News, pp. 2137, 2140-2141. The cases interpreting Title VII sex discrimination provisions agree that they were intended to place women on an equal footing with men. See Baker v. California Land Title Company, 507 F.2d 895, 896 n.2 (9th Cir. 1974), cert. denied, 422 U.S. 1046, 95 S. Ct. 2664, 45 L. Ed. 2d 699 (1975); Rosenfeld v. Southern Pacific Company, 444 F.2d 1219, 1225 (9th Cir. 1971).

Holloway v. Arthur Andersen & Co., 566 F.2d 659, 662 (9th Cir. 1977).

The Court is aware of arguments that have been made by some commentators who characterize sex and sexual orientation as "intricately interrelated" and who observe that courts have struggled to decipher whether the discrimination alleged is discrimination based on one's sex or on one's sexual orientation.  See, e.g., Barber, Re-Orienting Sexual Harassment, supra, at 516, 518-21.  Such commentators emphasize that the distinction between sex and sexual orientation is, at times, logically meaningless. Id.  This Court expresses no opinion on the merits of such views, for the distinction between sex and sexual orientation is not meaningless to *Congress*.  In fact, Congress has specifically and repeatedly rejected legislation that would have extended Title VII to protect an individual from discrimination based on his or her sexual orientation.  See, e.g., Employment Nondiscrimination Act of 1996, S. 2056, 104th Cong. (1996); Employment Non-Discrimination Act of 1995, H.R. 1863, 104th Cong. (1995); Employment Non-Discrimination Act of 1994, H.R. 4636, 103d Cong. (1994).

Third, case law throughout the circuits consistently holds that Title VII provides no protection for discrimination based on sexual orientation. See, e.g., Hamm v. Weyauwega Milk Prods., Inc., 332 F.3d 1058, 1062 (7th Cir. 2003) ("The protections of

Title VII have not been extended . . . to permit claims of harassment based on an individual's sexual orientation. Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc., 224 F.3d 701, 704 (7th Cir. 2000). Therefore, in same-sex harassment cases, the central question is whether the harassment occurred "because of the plaintiff's sex." Id.); King v. Super Service, Inc., 68 Fed. Appx. 659, 664 (6th Cir. 2003) (relying on case holding that the animosity directed towards the plaintiff because of his perceived sexual orientation was different from discrimination on the basis of sex); Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 261 (3d Cir. 2001) ("Title VII does not prohibit discrimination based on sexual orientation"); Simonton v. Runyon, 232 F.3d 33, 35 (2nd Cir. 2000) ("When interpreting a statute, the role of a court is limited to discerning and adhering to legislative meaning. The law is well-settled in this circuit and in all others to have reached the question that . . . Title VII does not prohibit harassment or discrimination because of sexual orientation"); Spearman v. Ford Motor Co., 231 F.3d 1080, 1084-85 (7th Cir. 2000) ("We have stated that 'the phrase in Title VII prohibiting discrimination based on sex' means that 'it is unlawful to discriminate against women because they are women and against men because they are men.' Ulane v. Eastern Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir. 1984). In other words, Congress intended the term 'sex' to mean 'biological male or biological female,' and not one's sexuality or sexual orientation. See id. at 1087. Therefore, harassment based solely upon a person's sexual preference or orientation (and not on one's sex) is not an unlawful employment practice under Title VII. Id. at 1085"); Williamson v. A.G. Edwards & Sons, Inc., 876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against homosexuals").

Mowery attempts to place his own interpretive "spin" on the alleged harassment and classify it as harassment based on sex or gender rather than as harassment based on sexual orientation.  Mowery contends that the alleged comments are based on his sex because they would not have been made if he were not male. The Court disagrees. First, Mowery himself believed that the comments and jokes concerned his perceived sexual orientation.   Second, the examples of harassment that are offered by Mowery are, on their face, comments that are unequivocally related to Mowery's perceived sexual orientation.

Third, Mowery's argument that the comments would not have been made if he

were not male merely reflects the sexual harassment jurisprudence which holds that harassing conduct must be considered in the "social context in which the particular behavior occurs."  Oncale, 523 U.S. at 81.  Here, it is difficult to separate many of Mowery's complaints from the significant amount of male horseplay that occurred in ECUA's blue-collar working environment.  Evidence indicates that Mowery *himself* even participated in this horseplay.  Terry Golson, an ECUA employee for over twenty years and a co-worker of Mowery's, stated that

> Yeah.  Like I said, we've always aggravated Steve Mowery about being gay, cutting up with him, you know.  But *he's all cutting up with everybody else about it* . . . I told him that we joke and kid about him being, you know, gay, but *he jokes and kids about everything*.  That's just something that's been going on, you know, forever.

Pl's Resp. to Mot. Summ. J. 9 (emphasis added).

Another of Mowery's co-workers, David Matthews, stated in his deposition that

> I just thought it was just playing and going back and forth . . . I don't really think they actually believed that [Mowery] was gay or homosexual or whatever.  I just think that they were playing around with him, because *they make them kind of comments to a lot of different people*.  They used to tease me about being a cowboy, and I don't even like country stuff, country music or nothing else.

Matthews Dep. 4:23-25, 5:1-5 (emphasis added).

Matthews's conclusion that Mowery was not singled out by his co-workers is corroborated by the alleged instance of sexual harassment when Mowery and another coworker were accused of "jumping naked together" on the trampoline in Mowery's yard after the coworker brought his children to Mowery's house to trick-or-treat on Halloween night.  Although each case must be examined on its own merits, "'in some cases, sexually explicit remarks among male coworkers may be 'simply expressions of animosity or juvenile provocation'" and not of sexual harassment.  Hamm, 332 F.3d at 1064.  Here, the alleged harassment occurred not because Mowery was male but because Mowery's co-workers either perceived that he was homosexual or because Mowery experienced and participated in a workplace environment characterized by teasing, animosity, or jostling among males.

The facts in this case resemble the facts in Hamm.  The Hamm court determined

that the alleged harassment was actually workplace teasing and not sexual harassment where Hamm was referred to as a "faggot," his close friendship with another male coworker was perceived by co-workers to be romantic in nature, co-workers believed he was gay because he was single, horseplay was a daily occurrence at work, the alleged harassers themselves and other co-workers were also victims of workplace pranks, and Hamm was told he had a "high-pitched voice," while being called "girl scout" and "kid." Id. at 1063-64.  Although some of the comments ("girl," "high-pitched voice") questioned Hamm's gender or sex, the Seventh Circuit in Hamm nevertheless affirmed the trial court's grant of summary judgment in favor of the defendant because the totality of the workplace environment and the context in which the comments were made undermined a claim of sexual harassment.  Id. at 1065.  Mowery, unlike Hamm, was not even the target of jokes and comments which questioned his gender or sex.  Therefore, because the comments that were directed at Mowery were based not on his sex or gender, but were either based on his perceived sexual orientation or were products of an ambience of blue-collar horseplay at ECUA, Mowery has failed as a matter of law to warrant submission of his sexual harassment claim to a jury.

### d.  Severity and Pervasiveness of the Alleged Harassment

Even if the alleged harassment was based upon Mowery's sex, Mowery fails to establish a prima facie case of sexual harassment because his harassment was not "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."  The Supreme Court has "always regarded that requirement as crucial . . . to ensure that courts and juries do not mistake ordinary socializing in the workplace - such as male-on-male horseplay or sexual flirtation - for discriminatory 'conditions of employment.'"  Oncale, 523 U.S. at 81 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993), citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  Factors examined to determine whether the environment is objectively hostile or abusive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. 17, 21-22 (1993).  In order to be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the

victim in fact did perceive to be so.  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

Construing the evidence in the light most favorable to Mowery, a jury could not reasonably conclude that the alleged harassment was objectively or subjectively severe enough or that it unreasonably interfered with Mowery's work performance to qualify as sexual harassment.  First, Mowery told a co-worker that the jokes and comments did not "really bother him that bad;" rather, it was Coltrane's participation in and encouragement of the teasing that bothered him.  (Matthews Dep. 6:6-16).  Second, Mowery presents no evidence regarding the psychological impact of the alleged harassment; rather, he makes conclusory allegations in the Complaint that he was "forced to endure" the comments and that they "negatively affected" him.  "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."  Black v. Zaring Homes, 104 F.3d 822, 826 (6th Cir. 1997).  That Mowery provides no information about his psychological well-being or the effects, if any, of the alleged harassment on his work performance is revealing.

Third, because the evidence indicates that Mowery participated in workplace teasing himself, Mowery apparently did not view the alleged harassment against him as abusive or severe or he presumably would have refused to participate in such behavior.  Fourth, Mowery was never touched or threatened by Coltrane or his co-workers.  Fifth, most of the conduct that Mowery identifies as being sexually discriminary occurred outside his presence and was later recounted to him by co-workers.  Mowery Dep. 3:14-19, 5:11-15, 6:20-25, 7:1-9, 8:3-4.  Occurrences outside of Mowery's presence are less severe, threatening, and humiliating than those occurring within his presence.  See Williams v. Jpi Jones Pharm., 2005 U.S. Dist. LEXIS 15429, *8 (M.D. Fla. 2005) ("many of these incidents that could be characterized as racially discriminatory were made outside Plaintiff's presence and simply relayed to her from other employees sometime after they had occurred or were not directed at Plaintiff personally.  Such occurrences are less severe, threatening, and humiliating than any that involved Plaintiff personally or that she actually observed take place"); Mason v. S. Illinois at Carbondale, 233 F.3d 1036, 1047 (7th Cir. 2000) ("comments heard 'through the grapevine' or 'second-hand' are not sufficiently severe or pervasive as to create a hostile work environment'); Mitchell v. Carrier Corp., 954 F.Supp. 1568, 1577 (M.D. Ga. 1995) (severity of remarks

diminished by fact that plaintiff learned of them second-hand); Black v. Zaring Homes, Inc., 204 F.3d 822, 826 (6th Cir. 1997) (comments were merely offensive and not harassing where the comments were not directed at the plaintiff although she was present).  Sixth, Mowery learned of most of the allegedly harassing comments during summer 2005, but failed to report them to Coltrane's supervisor until December 2005, even though Mowery could easily have reported them to Coltrane's supervisor when he met privately with the supervisor in October 2005.  Although the purpose of the private meeting in October 2005, was to inform Coltrane's supervisor of the concerns that ECUA employees were having regarding Coltrane's leadership style, Mowery interestingly failed to convey to Coltrane's supervisor the harassment that he himself was allegedly experiencing.  Because communication of the harassment allegedly experienced by Mowery at the hands of Coltrane would presumably have bolstered Mowery's argument that Coltrane was an ineffective leader, the only reasonable conclusion that can be inferred from Mowery's omission to inform the supervisor of Coltrane's conduct is that the behavior was not severe or pervasive.

Objectively, the alleged harassment was also not sufficiently severe, pervasive, or abusive.  For example, the comments that Mowery would be participating in the gay pride event at the beach on Memorial Day and that Mowery must be homosexual because he is forty years old, lives alone, owns a house and truck, and never flaunts or publicizes his sexual escapades with women do not demonstrate *hostility* toward Mowery or even toward homosexuals; rather, such comments are more appropriately viewed as stereotype-based *conclusions*, although incorrect, that Mowery is homosexual.  The Court fails to see how such conclusions "make it clear that the harasser[s] [were] motivated by general hostility" toward homosexuals or toward Mowery *who was not even homosexual.*  Moreover, as previously discussed, the jokes and comments must be objectively viewed in the context of a blue collar water/sewage company, comprised mostly of males who, including Mowery, engage in horseplay.  For all of these reasons, Mowery has failed as a matter of law to provide enough evidence that the harassment allegedly experienced by him was severe, pervasive, and sufficient to satisfy the prima facie case of sexual harassment under Title VII.

## 2. Retaliation (Count One)

Mowery alleges in Count One that after formally complaining about Coltrane's sexual and racial comments, he was retaliated against in violation of Title VII.  Under Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (1982).

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) a causal connection exists between the statutorily protected expression and the adverse employment action.  Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002).  If the plaintiff establishes a prima facie case of retaliation, a presumption of retaliation is created, and "'the burden shifts to the defendant to rebut the presumption by producing legitimate reasons for the adverse employment action.'"  Sullivan v. National Railroad Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999) (quoting Raney v. Vinson Guard Service, 120 F.3d 1192, 1196 (11th Cir. 1997)) (citation omitted), cert. denied, 528 U.S. 966 (1999).

In showing that it had a legitimate reason for its actions, the defendant's burden is "exceedingly light."  Perryman v. Johnson Prods. Co. Inc., 698 F.2d 1138, 1142 (11th Cir. 1983) (citing Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).  "The defendant only needs to produce evidence of a reason for its decision; it does not need to prove that it was actually motivated by that explanation."  Sermons v. Fleetwood Homes of Georgia, 227 F. Supp. 2d 1368, 1380 (S.D. Ga. 2002) (citing Burdine, 450 U.S. at 254).  The defendant's burden at this stage of the analysis is "merely one of production, not of proof."  Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982).  "As long as the defendant articulates its reason with some specificity so that the plaintiff has a 'full and fair opportunity to demonstrate pretext,' the defendant's burden has been met."  Sermons, 227 F. Supp. 2d at 1380 (quoting Burdine, 450 U.S.

at 255-56).

If the defendant produces legitimate reasons for its actions, "the presumption of retaliation disappears." Johnson v. Booker T. Washington Broad. Serv., 234 F.3d 501, 507 (11th Cir. 2000). The plaintiff must then attack that reason 'head on and rebut it' so as to show that the reason[s] [are] really pretext[s] for [retaliation]." Sermons, 227 F. Supp. 2d at 1381 (quoting Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)). Pretext can be established by evidence which "cast[s] sufficient doubt on the defendant's proffered [legitimate] reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994). Stated differently, the plaintiff may establish that he was the victim of [retaliation] "by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. The proffered explanation is unworthy of credence if the plaintiff demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder" could disbelieve it. Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)) (citation and internal quotation marks omitted). In order to prove pretext, the plaintiff may offer "direct evidence . . . in the form of statements and admissions or by circumstantial evidence in the form of comparative or statistical evidence." Woody v. St. Clair County Comm'n, 885 F.2d 1557, 1560 (11th Cir. 1989) (citing Miles v. M.N.C. Corp., 750 F.2d 867, 870 (11th Cir. 1985)). The plaintiff may also establish pretext by showing that ECUA did not rely on the proffered explanations for its actions. See Israel v. Sonic-Montgomery FLM, Inc., 231 F. Supp. 2d 1156, 1162 (M.D. Ala. 2002). A plaintiff may not, however, establish pretext "merely by questioning the wisdom of the employer's reason" as long as "the reason is one that might motivate a reasonable employer." Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) ("Federal courts do not sit to second-guess the business judgment of employers.").

Here, Mowery lodged complaints with his employer and with the EEOC concerning racial and sexual harassment. "Statutorily protected expression includes

filing complaints with the EEOC and complaining to superiors about sexual harassment." Johnson v. Booker T. Washington Broad. Serv., 234 F.3d 501, 507 (11th Cir. 2000) (citing Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir.1989)).   ECUA contends, however, that Mowery's complaints concerning his perceived sexual orientation do not qualify as "statutorily protected" activities under Title VII because Mowery's belief that he was a victim of sexual harassment was not objectively reasonable given that Title VII permits no cause of action for harassment based on perceived sexual orientation.  The Court, however, need not address that issue.  ECUA admits that Mowery's complaints about inappropriate racial jokes and statements are protected under Title VII.  It would be impossible, without direct and unequivocal evidence, for the Court to determine whether any given retaliatory act resulted from Mowery's complaints about race or whether it resulted from Mowery's complaints about his perceived sexual orientation.  Thus, the Court will assume that the first requirement of the prima facie case of retaliation is satisfied for each alleged retaliatory event.

With respect to the second requirement of the prima facie case of retaliation, an adverse employment action must "either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'  Stavropoulos v. Firestone, 361 F.3d 610, 617 (11th Cir. 2004) (quoting Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1117 (11th Cir. 2001)).  In other words, "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3rd Cir.1997)) (citation and internal marks omitted).  An alleged retaliatory act must be both subjectively and objectively retaliatory.  Gupta, 212 F.3d at 587.

The third requirement of the prima facie case of retaliation requires a causal connection between the protected expression and the alleged retaliation.  To establish [a] causal connection, a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" Clover v. Total Systems, Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Simmons v. Camden County Bd. of Educ., 757

F.2d 1187, 1189 (11th Cir. 1985)). "Temporal proximity between the protected activity and the adverse employment action may suffice to show a causal connection if there is any other evidence suggesting that the employer-defendant was aware of the protected expression." Ashmore v. J. P. Thayer Co., 303 F. Supp. 2d 1359, 1373 (D. Ga. 2004) (citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993)).

Each instance of retaliation alleged by Mowery has been distilled from the record and is separately analyzed below:

(1) Mowery was threatened with a letter of reprimand by the Assistant Director of Regional Services for a broken water main.  However, because Mowery admits that no reprimand or other disciplinary action was ever taken (Mowery Dep. 28:3-8), Mowery suffered no adverse employment action as a matter of law.  The law is well established that a threat of disciplinary action that is rescinded is not adverse employment action. Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001); Stavropoulos, 361 F.3d at 617; Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir. 2000); Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995); Blalock v. Dale County Bd. of Educ., 84 F. Supp. 2d 1291, 1311 (M.D. Ala. 1999).

(2) Mowery was not selected for five positions within ECUA for which he applied. However, Mowery admits that none of the five jobs represented promotions. When asked in his deposition whether he had applied for any promotions, Mowery answered, "No, there haven't been any promotions from what I make that I know of.  There haven't been any."  (Mowery Dep. 43:13-15).  In fact, Mowery admitted that *all* five jobs to which he applied paid *less* than his current position and that he was not even qualified for two of the jobs.  (Mowery Dep. 41-43).  Mowery stated that his reason for applying for the positions was so that he could transfer from his region and "start new, start fresh." (Mowery Dep. 42:15).  Therefore, at *best*, Mowery's attempts to obtain these positions within ECUA are most accurately viewed as requests for lateral transfers within the company.  Various courts have held that the employer's refusal to grant a request for a lateral transfer does not constitute an adverse employment action under Title VII.  See Ashmore, 303 F.Supp.2d at 1374; Garner v. Ashley Furniture Indus., 141 Fed. Appx. 287, 290 (5th Cir. 2005); Burger v. Central Apt. Mgmt., Inc., 168 F.3d 875, 879 (N.D. Tex. 1999).  As Chief Judge Posner stated:

> Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.

Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996).  Furthermore, no evidence exists that Mowery was denied employment in the positions for which he applied because of his complaints.

(3) Mowery was required to perform "unnecessary" work in 2003 after complaining in December, 2002.  Mowery stated that he was twice assigned to replace old water tubing that was not leaking.  (Mowery Dep. 19:2-5, 20:1-6, 21:1-13, 22:7-8).  ECUA disputes this allegation and contends that its records indicate that Mowery was required to replace the old water tubing only once.  (Dawson Aff. 15:85-86).  Nevertheless, construing the evidence in the light most favorable to Mowery and assuming that he was twice assigned to replace old water tubing that was not leaking, Mowery admits that replacing old water tubing is within his job duties.  (Mowery Dep. 20:24-25, 21:1).  Moreover, ECUA has articulated a legitimate, nonretaliatory reason for assigning this work to Mowery.  In the early 1990's, ECUA learned that its polybutylene tubing was defective.  (Dawson Aff. 9:27).  A national class action lawsuit against the manufacturer of polybutylene resulted in ECUA receiving in excess of $3 million to replace the polybutylene tubing.  (Dawson Aff. 9:27).  Utility service technicians were required to replace the polybutylene tubing even when the tubing was not actively leaking.  (Dawson Aff. 10:27).  ECUA also contends that other utility service technicians in Mowery's region and elsewhere were required to repair leaks and replace old tubing.  (Dawson Aff. 10:27).  Mowery has failed to offer any evidence which would indicate that ECUA's proffered legitimate reason is pretextual, nor does the record support such an inference.

(4) Mowery asserts that he was ordered to repair all four water leaks on a certain in 2003, even though three other trucks were working that day.  Mowery claims that

these assignments required a full day's work and that the tasks should have been apportioned equally to the other trucks.  (Mowery Dep. 22:11-18, 23:6-8).  However, Mowery admits that fixing such leaks is part of his job.  (Mowery Dep. 23:18-20).  Even if fixing leaks were not part of his job, the fact that Mowery was assigned extra work is not so materially adverse that it qualifies as an adverse employment action.  See DelaPaz v. N.Y. City Police Dep't, 2003 U.S. Dist. LEXIS 15179, *11 (D.N.Y. 2003) ("Plaintiff's complaints that he was assigned extra work and subjected to an unwarranted at-home visit after he called in sick do not qualify as adverse employment actions").  Furthermore, ECUA has articulated a legitimate, nonretaliatory reason for assigning this work to Mowery.  Mowery had been assigned to the "primary leak truck" on that day.  (Dawson Aff. 10:28).  All leak repair orders assigned to a particular region are ordinarily given to the primary leak truck, while the other trucks are assigned other tasks such as locating requests for utilities digging near ECUA facilities, performing service cuts for non-payment, and performing water/sewer service installation.  (Dawson Aff. 10:28).  It is not uncommon for the primary leak truck to be given four leak repair orders during a shift.  (Dawson Aff. 10:28).  Mowery has failed to show, nor does the record support, an inference that ECUA's legitimate nonretaliatory reason is pretextual.

(5) Mowery alleges that on several occasions, reported leaks were held and not assigned to him until late in the afternoon, requiring him to work overtime on several occasions.  (Mowery Dep. 24:1-20).  Again, Mowery acknowledges that repairing leaks is part of his job.  (Mowery Dep. 23:18-20).  The leaks were assigned to Mowery during his scheduled work time, and working overtime when necessary is required of all utility service technicians.  (Dawson Aff. 10:29).  Applicants for employment as utility service technicians are advised during the interview process that they will be expected to work overtime when necessary. (Dawson Aff. 10:29).  Mowery admits that he was paid for his overtime work. (Mowery Dep. 62:1-3).  Mowery was not singled out for overtime work.  In fact, ECUA indicates that Mowery worked the *least* amount of overtime among all utility service technicians in 2003, the year in which Mowery asserts that the retaliatory acts took place.  (Dawson Aff. 10:29, 11:29).  The regional director of ECUA stated in his affidavit that Mowery worked a total of 29.5 hours of overtime in the year 2003.  (Dawson Aff. 11:29).  The overtime that was worked by other utility service technicians

at ECUA was as follows: Eric Ball - 207.8 hours; Terry Golson - 183.9 hours; David Matthews - 132.3 hours; Tommy Taylor - 113.3 hours; Jerry Vincent - 294.1 hours; Scott Weber - 348.2 hours; Walter Williams - 240.1 hours; Jeremy Stewart - 92.6 hours. (Dawson Aff. 11:29).  Thus, Mowery's 29.5 hours of overtime represents approximately 8.5% of the amount of overtime worked by the utility service technician with the most amount of overtime and only 32% of the amount of overtime worked by the employee with the second least amount of overtime after Mowery.  These numbers are quite revealing and permit but one reasonable conclusion:  Mowery experienced no adverse employment action.

(6) Mowery was denied the opportunity to serve as Acting Assistant Regional Supervisor when the incumbent in that position went on medical leave in November, 2004.  (Mowery Dep. 32:20-25, 33:1-3).  Mowery contends that this denial deprived him of training for future jobs and cost him supervisory level pay. (Mowery Dep. 41:11-12). Denial of a fleeting promotional opportunity does not qualify as an ultimate or adverse employment action.  See Zaffuto v. City of Hammond, 308 F.3d 485, 493, n.8 (5th Cir. 2002) (denial of opportunity to serve as acting shift lieutenant while supervisor was on vacation far too minor to constitute an ultimate employment action); Harper v. City of Jackson Mun. Sch. Dist., 2005 U.S. App. LEXIS 21372 (5th Cir. 2005) (denial of opportunity to temporarily "fill in" as assistant principal and gain administrative experience not adverse employment action).

Moreover, it was Dawson, the director of regional services and Coltrane's supervisor, in consultation with Coltrane's replacement and not Coltrane himself, who selected the Acting Assistant Regional Supervisor's substitute.  (Dawson Aff. 11:30). This substantially lessens the possibility that a retaliatory motive was responsible for denying Mowery the opportunity.  See Casiano v. AT&T Corp., 213 F.3d 278, 284-85 (5th Cir. 2000) (finding no tangible employment action where an employee was denied access to a training program because another manager, not the harassing supervisor, was responsible for the decision).

Even assuming arguendo that the denial qualifies as an adverse employment action, the *twenty-month* time interval between Mowery's complaint in April, 2003, and the denial of this opportunity in November, 2004, attenuates and precludes the causal connection that is required in the prima facie case of retaliation.  See Clark Co. School

Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). See e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all").

Further, ECUA articulates a legitimate, nonretaliatory reason for denying Mowery the opportunity.  Only senior employees were asked to serve as Acting Assistant Regional Supervisor because Dawson determined "as a business matter that it was in ECUA's best interest to ask only the most senior and most qualified Utility Service Technicians to serve."  (Dawson Aff. 12:30).  The employee offered the position had five years more experience than Mowery.  (Mowery Dep. 34:6-8).  Other employees were also offered the opportunity, but each of these employees were also more experienced than Mowery.  Mowery and other similarly situated less senior employees were not offered the opportunity.  (Dawson Aff. 12:30).  Mowery has failed to offer evidence that ECUA's proffered legitimate reasons for denying him the opportunity to serve as a supervisor were pretexts for retaliation.

(7) Mowery alleges that low performance evaluation scores cost him merit increases.  (Mowery Dep. 43:22-23).  The Court finds such an allegation to be incredible considering that Mowery's performance evaluation scores actually *increased* after he complained.  Mowery received a score of 3.2 in 2002 before he complained.  (Shelton Aff. 3:15).  After he complained, he received scores of 3.5 in 2003 and 3.6 in 2004.  (Shelton Aff. 3:15-16).  Second, Mowery was not denied any merit increases because of his scores.  Merit money was not available for any ECUA employee in 2003 because the Escambia County Civil Service Board voted to award a three percent cost of living increase to all ECUA employees in lieu of any merit increases.  Like all other ECUA employees, Mowery received a cost of living increase effective October 1, 2003.  In 2004, the Escambia County Civil Service Board voted to award a one-and-a-half percent cost of living increase to all employees.  As a result, the maximum merit increase available to an ECUA employee in 2004 was one-and-a-half percent.  Mowery

received both the cost of living increase and the *maximum* merit increase that was available in 2004.  (Shelton Aff. 4:17).  Mowery has thus failed to prove that he suffered any adverse employment action.

(8) Mowery alleges retaliation in April, 2005, when the task of moving a flush hydrant that had been assigned to him was held and given to him upon his return to work after he had been on sick leave for three weeks.  Mowery argues that the task should have been reassigned to another employee.  (Mowery Dep. 36:18-25, 37:1-8).  This conduct does not qualify as an adverse employment action.  Mowery admits that it was his job to move flush hydrants.  (Mowery Dep. 38:1-5).  And even if the task should have been reassigned but was given to Mowery as extra work, assigning extra work to an employee is not an adverse employment action.  See DelaPaz, 2003 U.S. Dist. LEXIS 15179 at *11 ("Plaintiff's complaints that he was assigned extra work and subjected to an unwarranted at-home visit after he called in sick do not qualify as adverse employment actions").  Furthermore, the assignment occurred approximately one year after Mowery's complaint to human resources, thus destroying the inference of a causal connection between his complaint and the employer's conduct.

Moreover, ECUA has articulated a legitimate, nonretaliatory reason for requiring Mowery to complete the assigned task.  The work had been assigned to Mowery before he went on sick leave.  Mowery had not completed the work.  Unless the work is of an urgent nature, which ECUA argues was not the case here, ECUA contends that it is not uncommon for work to be held for the same employee to complete if that employee takes leave before the assignment can be finished.  Mowery returned from sick leave with no medical restrictions.  Although the work was not of the type that required assistance from another employee, ECUA nevertheless provided Mowery with a temporary employee to assist him with the task.  If Mowery had lingering physical issues associated with his medical leave that might have hindered his ability to complete the task, he could have instructed the temporary employee to complete much of the assignment himself.  If Mowery felt that he could not complete the work, he could have communicated this information to his supervisor.  This Mowery did not do.  (Dawson Aff. 12-13:31).  Mowery fails to show that ECUA's preferred legitimate, nonlegitimate retaliatory reason for assigning him the task was pretextual.

(9) Mowery alleges that he was assigned the task of repairing a leak and that when he requested assistance, he had to wait for an employee to travel a greater distance than two other employees who were much closer and who could have been sent to assist him.  (Mowery Dep. 39:17-25, 40:1-16).  Again, Mowery admits that fixing such leaks is part of his job.  (Mowery Dep. 40:17-19).  He also admits that employees can be assigned to work *anywhere* in the region.  (Mowery Dep. 40:20-25).  Mowery provides no authority to support the notion that simply requiring an employee to wait longer for assistance in order to fix a water leak qualifies as an "adverse employment action."  Moreover, the employees who were allegedly within close proximity to the scene were on their lunch breaks and had already fixed four leaks that day.  (Mowery Dep. 40:3-13).  These facts alone support legitimate, nonretaliatory reasons for the employer's conduct.  Mowery has made no attempt to demonstrate pretext.

(10) Mowery speculates that because several co-workers avoided him and would not talk to him, he was a victim of retaliation.  (Mowery Dep. 30:20-25, 31:5-11).  Assuming that co-workers did avoid Mowery, such conduct does not constitute adverse employment action.  See Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997) (hostility, personal animus, disrespect, and ostracism are insufficient to constitute adverse employment actions under Title VII); Brazoria County v. EEOC, 391 F.3d 685, 693 (5th Cir. 2004) ("For the claimed ostracism, the retaliatory activities did nothing more than affect conditions in the workplace.  None of the events listed by the EEOC are akin to the 'hiring, granting leave, discharging, promoting, and compensating' examples listed in Mattern, 104 F.3d at 707. (We note . . . that even courts that do not apply an 'ultimate employment decision' standard have rejected retaliation on the basis of ostracism. E.g., Manatt v. Bank of America, NA, 339 F.3d 792, 803 (9th Cir. 2003) ("Mere ostracism in the workplace is not grounds for a retaliation claim")).

(11) Mowery alleges that he was improperly transferred from Region 1 to Region 2 without consultation.  The transfer occurred, however, as part of a business realignment.  Mowery was not the only employee transferred; rather, three other utility service technicians were transferred.  (Dawson Aff. 13:33).  Employees' preferences were considered but were not binding if inconsistent with management's judgment.  (Dawson Aff. 13:33).  Mowery's transfer did not affect his compensation, hours, work schedule, or benefits.  (Dawson Aff. 14:33); rather, Mowery was simply assigned to a

new geographic location with a new supervisor.  Mowery's transfer, without a change in status, benefits, or salary, does not qualify as an adverse change in employment as a matter of law.  Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996) (reassignments or transfers without more do not qualify as materially adverse changes in the terms or conditions of employment); Davis v. Town Lake Park, 245 F.3d 1232, 1244 (11th Cir. 2001) ("Title VII is not designed to make federal courts 'sit as a super-personnel department that reexamines an entity's business decisions.' Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) . . . Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities").  Moreover, Dawson asserts that the realignment within ECUA which resulted in the transfers was the result of legitimate business decisions. (Dawson Aff. 13:33).

In support of his claim that his involuntary transfer constituted retaliation, Mowery cites to Berman v. Orkin Exterminating Co., Inc., 160 F.3d 697 (11th Cir. 1998).  The Berman Court held that the prima facie case for retaliation was met where the employee was involuntarily transferred; his sales territory was reduced; the manager who ordered the transfer was not only aware of the complaint but was also motivated chiefly by the conflict of interest between the alleged harasser and the transferred employee; the first transfer occurred within five weeks of the filing of the EEOC complaint; and the second transfer occurred within a couple of months of the complaint.  Id. at 702.  The facts in Berman, however, are not comparable to the facts in this case.  In Berman, the reduction in sales territory translated into the potential loss of income for the employee. Mowery, however, suffered no loss of income.  Moreover, nothing in the record indicates that Dawson or Coltrane's replacement were motivated by the conflict of interest between Mowery and the alleged harassers.  Coltrane, in fact, was no longer Mowery's supervisor and had been demoted at the time of Mowery's transfer. Moreover, unlike the temporal proximity that existed between the filing of the complaints and the two transfers in Berman (five weeks and a few months), Mowery's transfer occurred *two years* after his complaint was filed.  Thus, it is inappropriate to compare this case to Berman.  Because Mowery's transfer did not constitute an adverse employment reaction; the causal connection component of the prima facie case is

nullified by the lack of temporal proximity between the complaint and the allegedly adverse action; ECUA has articulated a legitimate, nonretaliatory reason for the transfer; and Mowery has failed to show pretext, Mower's claim of retaliation fails as a matter of law.

In summation, assuming arguendo that Mowery has satisfied the first requirement of the prima facie case of retaliation, Mowery nevertheless fails to present a case of retaliation sufficient enough to present to a jury under Title VII.  Mowery cannot establish that he suffered adverse employment actions or causal connections between his complaints and the alleged adverse employment actions.  Furthermore, ECUA  has satisfied its burden of producing legitimate, non-retaliatory reasons for each action, and Mowery has failed to prove that such reasons were pretextual.  Accordingly, Mowery's claim that he was retaliated against under Title VII fails as a matter of law.

### 3. Sex Discrimination and Retaliation Based on 42 U.S.C. § 1983 (Count Three)

Mowery alleges in Count Three of the Complaint that he was the victim of sex discrimination and retaliation under 42 U.S.C. § 1983.  Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Here, Mowery fails to state a claim under Section 1983 with respect to his charges of sex discrimination and retaliation for several reasons.  First, under § 1983, Mowery must show a "violation of a right secured by federal law."  Skinner v. City of Miami, Fla., 62 F.3d 344, 347 (11th Cir. 1995).  Harassment based on sexual orientation or perceived sexual orientation are not actionable under either the Constitution or federal law.  Second, under § 1983, Mowery must demonstrate that the alleged discriminatory and retaliatory acts committed against him were the products of an "official policy or custom" of discrimination and retaliation at ECUA.  See Cuesta v. School Bd. of Miami-Dade County, Fla., 285 F.3d 962, 966 (11th Cir. 2002) ("The

'official policy or custom must be the moving force of the constitutional violation in order to establish liability of a government body under § 1983.' Gilmere v. City of Atlanta, Ga., 737 F.2d 894, 901 (11th Cir. 1984) (internal quotes omitted). A plaintiff 'must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997)"). The Complaint, as well as the evidentiary record, are devoid of facts demonstrating that ECUA's alleged discriminatory and retaliatory actions were products of an "official policy or custom" of discrimination and retaliation at ECUA. In fact, it is undisputed that ECUA has an established policy against harassment and retaliation. Third, Mowery's § 1983 claim fails because the same requirements necessary to establish prima facie cases of sexual harassment and retaliation under Title VII apply to claims arising under § 1983. Arrington v. Cobb County, 139 F.3d 865, 873 (11th Cir. 1998). Because the Court has concluded that Mowery fails to satisfy the prima facie cases of harassment and discrimination under Title VII, Mowery's claims under § 1983 also fail.

### 4. Sex Discrimination and Retaliation Based on 42 U.S.C. § 1981 (Count Three)

Mowery's claims of sex discrimination and retaliation based on 42 U.S.C. § 1981 also fail. Section 1981 provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, liens, and exactions of every kind, and to no other.

Section 1981 was enacted to prevent discrimination based on *race*, not discrimination based on sex. See Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960-961 (11th Cir. 1997). It is well established that sexual harassment is not actionable under Section 1981. McCoy v. Johnson Controls World Servs., 878 F. Supp. 229, 232-33 (S.D. Ga. 1995) (citing Runyon v. McCrary, 427 U.S. 160, 167 (1976)). Thus, Mowery's claim of sexual harassment under § 1981 fails to state a claim upon which relief can be granted.

Similarly, ECUA is also entitled to summary judgment on Mowery's section 1981 retaliation claim.  See Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 961 (11th Cir. 1997) (holding that prima facie case of retaliation under § 1981 could not be established when prima facie case of retaliation was not satisfied under Title VII); see also Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well").  Because Mowery has failed to satisfy the prima facie case of retaliation under Title VII, he has failed to establish a prima facie case of retaliation under § 1981.

### III.  CONCLUSION

1. The plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that he was the victim of sex discrimination and retaliation under Title VII and 42 U.S.C. §§ 1981 & 1983.

2. Defendant's Motion for Summary Judgment (Doc. 16) is granted.

3. The clerk shall enter judgment dismissing the plaintiff's claims with prejudice.

4. The clerk shall close the file.

Ordered on February 10, 2006.


**/s/ Richard Smoak**
**Richard Smoak**
**United States District Judge**